02-10-434-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-10-00434-CV

 

 


 
 
 Allen Scott 
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Christian Methodist Episcopal Church, Senior Bishop
 William Graves, and Bishop Kenneth Wayne Carter
 
 
  
  
  
  
  
 and
  
 
 
 APPELLEES 
 
 
 
 
 Bishop kenneth wayne carter
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 allen scott
 
 
  
 
 
 APPELLEE 
 
 


 

----------

 

FROM THE 48th
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

 

I. Introduction

          Bishop
Kenneth Wayne Carter and Allen Scott separately appeal the trial court’s judgment
in this case, which included a judgment on the jury verdict in favor of Scott
and against Carter and a judgment notwithstanding the verdict (JNOV) in favor
of Christian Methodist Episcopal Church (the Church).[2]
 We affirm.

II. Factual
and Procedural Background

          Scott
was a licensed local preacher for the Church’s Eighth Episcopal District
(Dallas).  Carter, Bishop for the Church’s Tenth Episcopal District,[3]
asked Scott to come to his home, which Scott asserted was the Tenth Episcopal
District’s office, to interview for a position as Carter’s driver.  During this
“interview,” a sexual encounter occurred between the men, which Carter asserted
was consensual and which Scott asserted was not.

          According
to Scott, Carter asked him to change a light bulb in a storage closet.  When he
bent down to change the light bulb, Carter was beside him, but when he went to
unscrew a second light bulb, Carter was behind him.  Scott then felt his pants
being pulled down by Carter.  Scott turned around, and Carter grabbed Scott’s
head and put his penis in Scott’s mouth.  He ejaculated on Scott and into
Scott’s mouth “within five to ten seconds.”  Scott testified that Carter
instigated the conduct.

          According
to Carter, Scott instigated the conduct and was the “aggressor.”  Carter stated
that he recalled massaging Scott’s shoulder after he finished removing the
light bulbs, then Scott touched Carter, and they moved to the couch “where the
action took place.”  Carter testified that he masturbated in front of Scott and
that Scott then proceeded to perform oral sex on Carter.  Carter said he
ejaculated into his hand and not on Scott or in Scott’s mouth.

          Scott
sued Carter, the Church, and Senior Bishop William Graves for negligence,
negligence per se, gross negligence, and malice.[4]  The jury found:  (1) Carter
was acting within the scope and course of his employment with the Church; (2)
the Church’s negligence proximately caused the occurrence; (3) Carter assaulted
Scott; (4) the Church was 25% liable and Carter was 75% liable; and (5) Scott
was entitled to $350,000 for past mental anguish and $100,000 for future mental
anguish.  In response to the parties’ post trial motions, the trial court
entered judgment in favor of Scott against Carter and entered take nothing
judgments in favor of the Church and Senior Bishop William Graves.  These
appeals followed.

III. 
Carter’s Issues

          In
three issues, Carter argues that the evidence is legally and factually
insufficient to support the jury’s finding that he assaulted Scott, that the
evidence is legally insufficient to support Scott’s mental anguish damages, and
that the evidence is factually insufficient to support Scott’s mental anguish
damages such that the trial court should have ordered a remittitur.

A. 
Sufficiency Standards of Review 

          We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334
(Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, “No
Evidence” and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361,
362–63 (1960).  In determining whether there is legally sufficient evidence to
support the finding under review, we must consider evidence favorable to the
finding if a reasonable factfinder could and disregard evidence contrary to the
finding unless a reasonable factfinder could not.  Cent. Ready Mix Concrete
Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).  Anything more than a scintilla of
evidence is legally sufficient to support the finding.  Cont’l Coffee Prods.
Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch v. Hornsby,
935 S.W.2d 114, 118 (Tex. 1996).

          When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the credible
evidence supporting the finding is so weak, or so contrary to the overwhelming
weight of all the evidence, that the answer should be set aside and a new trial
ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986) (op.
on reh’g); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Garza v.
Alviar, 395 S.W.2d 821, 823 (Tex. 1965).  When conducting a factual
sufficiency review, a court of appeals must not merely substitute its judgment
for that of the trier of fact.  Golden Eagle Archery, Inc. v. Jackson,
116 S.W.3d 757, 761 (Tex. 2003).  The trier of fact is the sole judge of the
credibility of witnesses and the weight to be given to their testimony.  Id.

          Further,
we review a complaint that damages are excessive for factual sufficiency. See
Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406 (Tex.) (citing Rose
v. Doctors Hosp., 801 S.W.2d 841, 847–48 (Tex. 1990), and Pope v. Moore,
711 S.W.2d 622, 624 (Tex. 1986)), cert. denied, 525 U.S. 1017 (1998). 
If we find the evidence to be factually sufficient, we are not at liberty to
order a remittitur.  Wal-Mart Stores, Inc. v. Odem, 929 S.W.2d 513, 528
(Tex. App.—San Antonio 1996, writ denied) (op. on reh’g); see also Larson
v. Cactus Util. Co., 730 S.W.2d 640, 641 (Tex. 1987) (stating that if part
of a damage verdict lacks sufficient evidentiary support, the proper course is
to suggest a remittitur of that part of the verdict).  Whether damages are
excessive and whether a remittitur is appropriate are factual determinations
that are final in this court.  Ellis, 971 S.W.2d at 407; see also
Tex. Const. art. V, § 6; Tex. Gov’t Code Ann. § 22.225(a) (West 2004 &
Supp. 2011); Tex. R. App. P. 46.3, 46.5.

B.  Assault

          Carter
challenges the legal and factual sufficiency of the evidence to support the
jury’s assault finding in this variation of the classic “he said–she said”
dispute.  As previously recounted, we may not substitute our judgment for that
of the trier of fact, who is the sole judge of the credibility of witnesses and
the weight to be given their testimony.  See Golden Eagle Archery, 116
S.W.3d at 761.  This is so because we are not witness to the demeanor of those
testifying—their voice inflections, body movements, pauses in speech, and other
overall visual and verbal cues—which can affect the fact finder’s determination
of the veracity of their testimonies.  See Kreitzman v. Woodford Livestock
Transp., No. 02-04-00022-CV, 2005 WL 2897644, at *3 (Tex. App.—Fort Worth
Nov. 3, 2005, no pet.) (mem. op.) (stating that the jury, not the appellate
court, is in the best position to judge the credibility of the evidence because
“[w]e cannot discern facial expressions, hear voice inflections, observe body
language or witness overall demeanor from a cold black and white record”).

          Scott
recounted a factual scenario pointing to an assault, and Carter recounted a
factual scenario pointing to a consensual encounter.  As there was no third
party witness or independent evidence supporting either version,[5]
it was up to the trier of fact to determine the truth from their testimonies.  The
jury chose to believe Scott, and the evidence offered by Scott that an assault
occurred was more than a scintilla.  See Cazarez, 937 S.W.2d at 450.  Further,
this is not a factual dispute in which we will intervene, as we cannot say that
the jury’s verdict in favor of Scott is supported by evidence that is so weak,
or so contrary to the overwhelming weight of all the evidence that the jury’s answer
to the assault inquiry should be set aside and a new trial ordered.  See
Pool, 715 S.W.2d at 635.  Therefore, we conclude that the evidence is
legally and factually sufficient to support the jury’s assault finding, and we
overrule Carter’s second issue.

C.  Mental
Anguish and Remittitur

          In
his first and third issues, Carter claims that the evidence is legally and
factually insufficient to support the finding that Scott suffered mental
anguish damages and that the trial court should have ordered a remittitur.

          With
regard to mental anguish damages, the Texas Supreme Court has stated,

          The
term “mental anguish” implies a relatively high degree of mental pain and
distress.  It is more than mere disappointment, anger, resentment or
embarrassment, although it may include all of these.  It includes a mental
sensation of pain resulting from such painful emotions as grief, severe disappointment,
indignation, wounded pride, shame, despair and/or public humiliation.

 

          This
definition requires a jury to distinguish between disappointment and severe
disappointment, between embarrassment and wounded pride, between anger and
indignation.  It is little wonder that courts and juries have found this and
similar definitions of mental anguish “somewhat unwieldy.”

 

          When
a challenge is made to the sufficiency of the evidence to go to the jury or to
support the jury’s finding, the same type of problem persists.  The reviewing
court must distinguish between shades and degrees of emotion.  These
distinctions are critical under our substantive law because evidence of lesser
reactions cannot support an award of mental anguish damages.

 

Parkway
Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995)
(citations omitted).  If a claimant fails to present direct evidence of the
nature, duration, or severity of his anguish, we apply traditional “no
evidence” standards to determine whether the record reveals any evidence of a
high degree of mental pain and distress that is more than “mere worry, anxiety,
vexation, embarrassment, or anger” to support any award of damages.  Id.;
see also Serv. Corp. Int’l v. Guerra, 348 S.W.3d 221, 231 (Tex. 2011)
(“Even when an occurrence is of the type for which mental anguish damages are 
recoverable, evidence of the nature, duration, and severity of the mental
anguish is required.”).

Further,
the court has also stated,

          Not only
must there be evidence of the existence of compensable mental anguish, there
must also be some evidence to justify the amount awarded . . . .  While the
impossibility of any exact evaluation of mental anguish requires that juries be
given a measure of discretion in finding damages, that discretion is limited.  Juries
cannot simply pick a number and put it in the blank.  They must find an amount
that, in the standard language of the jury charge, “would fairly and reasonably
compensate” for the loss.  Compensation can only be for mental anguish that
causes “substantial disruption in . . .  daily routine” or “a high degree of
mental pain and distress”.  There must be evidence that the amount found is
fair and reasonable compensation, just as there must be evidence to support any
other jury finding.  Reasonable compensation is no easier to determine than
reasonable behavior—often it may be harder—but the law requires factfinders to
determine both. And the law requires appellate courts to conduct a meaningful
evidentiary review of those determinations.

Saenz
v. Fidelity & Guar. Ins., 925 S.W.2d 607, 614 (Tex.
1996) (citations omitted) (stating that the evidence was insufficient to
support the jury’s $250,000 mental anguish award when the only evidence
pertaining to mental anguish was Saenz’s testimony that she worried that she
and her husband would lose their home and that they could not afford their future
medical bills).

          Scott
testified that he was shocked by the assault and was still shocked at the time
of the trial and that he felt less human after the encounter.  He testified
further that he was taking medication; had been seeing a psychologist since the
incident; had problems eating, sleeping, and trusting other people as a result
of the assault; was being regularly tested for HIV and other sexually
transmitted diseases;[6] and felt that his faith
had been shaken.  Scott’s wife confirmed that Scott had problems eating and
sleeping, that he suffered from anxiety, and that he underwent regular blood
tests to check for HIV.

          Scott
also testified that he did not feel like his wife and children looked at him
the same now and that his psychologist had suggested that he leave the Church
because some of the membership would no longer talk with him, look at him, or
pray with him.  During Scott’s cross-examination, he admitted that he did not
report the assault to the police until around thirty days after it occurred.[7] 
Scott did not testify about any economic loss as a result of the assault.  Further,
when given an opportunity to describe her husband’s anxiety, Scott’s wife could
only describe him as “restless.”  However, she also testified that since the
incident in March 2007, Scott had been depressed to the point that she felt
that she was “losing [her] best friend,” and she described his inability to
sleep for more than a few hours at a time and said that he had developed
stomach problems.

          Based
on the evidence set out above, the jury could have found that Scott suffered
from mental anguish.  We conclude that the evidence is legally sufficient.  See
Cazarez, 937 S.W.2d at 450; see also Fifth Club, Inc. v. Ramirez,
196 S.W.3d 788, 797 (Tex. 2006) (holding that the evidence was legally
sufficient to support jury’s award of future mental anguish damages when
Ramirez and his wife testified that Ramirez continued to be depressed, humiliated,
non-communicative, angry, and unable to sleep, that he continued to have
headaches and nightmares, and that his daily activities and relationships with
his wife and daughter continued to be detrimentally affected almost two years
after being assaulted); O’Dell v. Wright, 320 S.W.3d 505, 514 (Tex.
App.—Fort Worth 2010, pet. denied) (holding that Wright presented legally
sufficient evidence of compensable mental anguish when she testified about the
many occasions on which she had experienced anxiety, nausea, shakes, and
nightmares).

          Applying
the factual sufficiency standard of review to the evidence adduced at trial
regarding the impact that the assault had on Scott, considering the nature of
the assault and Scott’s testimony about the effect that it had on him and his
life, we cannot say that the evidence supporting the jury’s finding of Scott’s
mental anguish and damages is so weak or so contrary to the overwhelming weight
of all the evidence as would lead us to conclude that the damages are excessive.
 See Pool, 715 S.W.2d at 635; O’Dell, 320 S.W.3d at 515
(concluding that the amount awarded was fair and reasonable based on the
plaintiff’s testimony about the disruption to her life and the personal toll
taken by the events surrounding an assault and sexual harassment); see
generally E. Tex. Med. Ctr. EMS v. Nieves, No. 10-09-00055-CV, 2010 WL
5419003, at *1, 3–4 (Tex. App.—Waco Dec. 29, 2010, no pet.) (mem. op.)
(affirming an award of $750,000 for past physical pain and mental anguish and
$250,000 in future physical pain and mental anguish after an assault and sexual
assault); Fort Worth Cab & Baggage Co. v. Salinas, 735 S.W.2d
303, 304–05 (Tex. App.—Fort Worth 1987, no writ) (affirming on remand a multi-million-dollar
damages award—which included mental anguish—against cab company after a cab
driver raped, orally sodomized, and robbed a woman in front of her two
children).  Therefore, we conclude that the evidence is factually sufficient to
support Scott’s mental anguish damages, and we cannot say that the trial court
should have ordered a remittitur.  We overrule Carter’s first and third issues.

IV. 
Scott’s Issues

          In
his two issues, Scott appeals the trial court’s JNOV as to the Church,
contending that the trial court should have entered judgment against the Church
and the Senior Bishop in accordance with the jury’s verdict.  Scott argues that
the Church was aware of Carter’s prior sexual misconduct, “never should have
hired Bishop Carter, nor should the Church have sat silent while one of its
Bishops induced unknowing employees into the very situation that occurred on
March 22, 2007.”  He also complains that the trial court erred by disregarding
the jury’s determination that Carter was working in the scope and course of his
employment such that the Church’s negligence proximately caused the assault.

          The
Church responds that the trial court’s JNOV was appropriate because there was
no evidence that the assault was within the scope and course of Carter’s duties
and that Carter’s predatory actions were not foreseeable.

A. 
Standard of Review

          A
trial court may disregard a jury verdict and render a JNOV if no evidence
supports the jury finding on an issue necessary to liability or if a directed
verdict would have been proper.  See Tex. R. Civ. P. 301; Tiller v.
McLure, 121 S.W.3d 709, 713 (Tex. 2003); Fort Bend Cnty. Drainage Dist.
v. Sbrusch, 818 S.W.2d 392, 394 (Tex. 1991).  A directed verdict is proper
only under limited circumstances: (1) when the evidence conclusively
establishes the right of the movant to judgment or negates the right of the
opponent; or (2) when the evidence is insufficient to raise a material fact
issue.  Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29
S.W.3d 74, 77 (Tex. 2000); Playoff Corp. v. Blackwell, 300 S.W.3d 451,
454 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh’g).

          To
determine whether the trial court erred by rendering a JNOV, we view the
evidence in the light most favorable to the verdict under the well-settled
standards that govern legal sufficiency review.  See Ingram v. Deere,
288 S.W.3d 886, 893 (Tex. 2009); Wal-Mart Stores, Inc. v. Miller, 102
S.W.3d 706, 709 (Tex. 2003).  We must credit evidence favoring the jury verdict
if reasonable jurors could and disregard contrary evidence unless reasonable jurors
could not.  See Tanner v. Nationwide Mut. Fire Ins. Co., 289 S.W.3d 828,
830 (Tex. 2009); Islas, 228 S.W.3d at 651.

B.  Scope
and Course of Employment

          The
first question put to the jury was whether Carter acted in the scope and course
of his employment with the church when he asked Scott to meet with him.  Under
the theory of respondeat superior, an employer can be vicariously liable for
the torts of an employee if the employee is acting within the scope and course
of his employment.  Goodyear Tire & Rubber Co. v. Mayes, 236 S.W.3d
754, 757 (Tex. 2007).  However, the employer is liable for its employee’s tort
only when the tortious act falls within the scope of the employee’s general
authority in furtherance of the employer’s business and for the accomplishment
of the object for which the employee was hired.  Id. (quoting Minyard
Food Stores, Inc. v. Goodman, 80 S.W.3d 573, 577 (Tex. 2002)).  If the
employee deviates from the performance of his duties for his own purposes, the
employer is not responsible for what occurs during that deviation.  Id.
(quoting Minyard, 80 S.W.3d at 577); see also Sanders v. Casa View
Baptist Church, 898 F. Supp. 1169, 1179 (N.D. Tex. 1995) (noting that
sexual misconduct by a member of the clergy is beyond the cleric’s scope of
employment), aff’d, 134 F.3d 331 (5th Cir.), cert. denied, 525
U.S. 868 (1998); Doe v. S. Cent. Spanish Dist. of Church of God, No. 05-01-01850-CV,
2002 WL 31296620, at *4 (Tex. App.—Dallas Oct. 14, 2002, no pet.) (mem. op.,
not designated for publication) (stating that under Sanders, cleric’s
sexual misconduct while pastor was beyond the scope of his employment).  Because
the conduct at issue here was beyond the scope of Carter’s position in the
Church as a bishop and was in no way engaged in for the benefit of the Church,
the trial court correctly granted the Church’s motion for JNOV as to whether
Carter acted in the scope and course of his employment.  We overrule Scott’s
second issue.

C. 
Negligence

          The
second jury question asked whether the negligence, if any, of the Church
proximately caused “the occurrence in question.”  Claims against an employer
for negligent hiring, retention, or supervision are based on direct, rather
than vicarious, liability.  Morris v. JTM Materials, Inc., 78 S.W.3d 28,
49 (Tex. App.—Fort Worth 2002, no pet.).  The main advantage to this type of
claim is that it does not require “a finding that the employee was acting in
the scope of his employment when the tortious act occurred.”  Wrenn v.
G.A.T.X. Logistics, Inc., 73 S.W.3d 489, 496 (Tex. App.—Fort Worth 2002, no
pet.) (op. on reh’g).  “[A]n employer is liable for negligent hiring,
retention, or supervision if it hires an incompetent or unfit employee whom it
knows, or by the exercise of reasonable care should have known, was incompetent
or unfit, thereby creating an unreasonable risk of harm to others” that
proximately causes damages.  Morris, 78 S.W.3d at 49; see also
Ramirez, 196 S.W.3d at 796 (“Negligence in hiring requires that the
employer’s ‘failure to investigate, screen, or supervise its [hirees]
proximately caused the injuries the plaintiffs allege.’” (quoting Doe v.
Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995)).  Absent
a showing of foreseeability, an employer cannot be liable as a matter of law
for negligent hiring, supervision, or retention.  Wrenn, 73 S.W.3d at
496.

1.   
Evidence

          Pastor
Woodrow Foreman testified that in the 1980s or 1990s, he had heard that Carter
“liked boys . . . he was gay,” and he referenced an incident that occurred in
Mississippi in 1990, in which a young male musician stood up on Sunday before
the church service was over and said he wanted Carter to stop bothering him.  Foreman
also stated he recalled mentioning to Scott a long time before the “interview”
that he had heard Carter was gay and told Scott at some point “to be careful”
because of the rumors he had heard.[8]  However, he also
testified that he was not worried that Carter would attempt to rape Scott.  Once
Foreman heard about the incident from Scott, he did not report it to anyone but
“may have talked to some people about it.”  Foreman was concerned about the
Church’s reputation and said that it was discussed with Scott that “this was
not about him nor Bishop Carter but the CME Church.”

          Reverend
Van Carl Williams stated that Scott called him after the incident and told him
that Carter had ejaculated on him and asked Williams what he should do.  Williams
told him that no matter what he decided to do, as his pastor, he would support
him.  During cross-examination, Williams said that he had heard rumors about
Carter’s sexuality:

Q.  Okay.  And have
you heard from the Church or anywhere else rumors that have been going on about
Bishop Carter?

 

A.  Have I heard from
. . . 

 

Q.  From the Church
or anywhere else, dealings with people in the Church, any rumors about Bishop
Carter?

 

A.  Yes.

 

Q.  And have you
heard rumors about his sexuality?

 

A.  Yes.

 

Q.  Okay.  And have
you heard that just from a few people, many people?

 

A.  Few and many are—

 

Q.  Kind of
subjective, right?

 

A.  Yes, subjective.

 

Q.  Okay.  Fair
enough. Fair enough.

 

Let me ask you this—

 

A.          
 Have
I heard it from more than three people, yes.

 

Q.  Okay.

 

A.  I don’t know if
that’s few or many.

 

Q.  Okay.  Okay.  Now,
do you also know that there are people in the Church who don’t like Bishop
Carter because of his sexuality?

 

A.          
 Yes.

          Elder
Ernest Williams testified that he had heard rumors that Carter was homosexual but
that he never investigated the rumors, stating that “it wasn’t [his] job to
investigate.”  He also testified that no background check was done on Carter.  Senior
Bishop William Graves also verified that a background check was not done on
Bishop Carter; however, “[e]very four years, when [Carter] makes his report to
the General Conference, his character is looked at.”

          Claude
Parker and Michelle Benson testified that they had worked with Carter when all
three worked for the Fort Worth Independent School District (ISD) as band
directors.  In 1999, Parker’s and Carter’s bands took a trip to Disneyworld, and
the two men shared a room at a resort.  Parker was late getting to their room
on the first night, and when he walked in, he saw Carter masturbating on the
bed.  Parker immediately walked out of the room and called his “pyramid,” which
consisted of Benson and his principal, to report what had happened; he filed a
complaint with the Fort Worth ISD when they returned from the trip.

          Benson
had hired Carter as an assistant high school band director.  She testified that
she received a complaint that Carter was “offering young boys money for sexual
favors” at a band camp at Prairie View A&M.[9]  She reported this
incident and filed a complaint against Carter with the Fort Worth ISD.  During
her testimony, Benson also referred to other complaints that she had received
from young men about Carter, but she did not go into detail.  She also stated
that none of these complaints indicated that Carter had forced himself on any
of them.  Neither Parker nor Benson was associated with the Church, and there
was no evidence that they had communicated with anyone with the Church.

          Carl
Calhoun testified that in the early 1990s, he was involved in a Gospel Fest
with Carter, but like Parker and Benson, he had no connection with the Church.  Carter’s
church had arranged to pay Calhoun and his fellow musicians for providing
musical accompaniment for a choir.  Calhoun went to pick up the check at
Carter’s church, and after a tour of the church, Carter made an advance on him.
 In the church’s bathroom, Calhoun opened a stall door and saw Carter “doing . . . something
to himself,” which appeared to be masturbation.  Calhoun said during cross-examination
that he remembered Carter grabbing him and pulling at his clothes.  Calhoun did
not report this incident to the police or to anyone with the Church.

2.   
Analysis

          The
jury was charged that “[i]n order to be a proximate cause, the act or omission
complained of must be such that a person using ordinary care would have
foreseen that the event, or some similar event, might reasonably result therefrom.” 
Therefore, an affirmative finding of negligence by the jury required evidence
that it was foreseeable by the Church clergy that Carter would assault Scott on
the occasion in question.  Assault was defined for the jury as follows, “A
person commits an assault if without consent he intentionally or knowingly
causes physical contact with another when he or she knows or should reasonably
believe that the other will regard the contact as offensive or provocative.”

          Reviewing
the evidence known to the Church’s clergy concerning Carter’s attempted
physical relationships with other males, and bearing in mind the definition of
assault and that the only evidence of Carter actually touching another
individual came from Carl Calhoun, who was not associated with the Church and
who did not report the incident to the police or the Church, we hold that there
was no evidence that it was foreseeable to the Church that Carter would assault
Scott.  The trial court therefore correctly granted the Church’s motion for JNOV
as to the second jury question, and we overrule Scott’s first issue.

V.  Conclusion

          Having
overruled all of Scott’s and Carter’s issues, we affirm the trial court’s
judgment.

 

 

BOB MCCOY

JUSTICE

 

PANEL:  DAUPHINOT, GARDNER, and
MCCOY, JJ.

DELIVERED:  January 5, 2012









[1]See Tex. R. App. P. 47.4.





[2]No question answered by
the jury established liability as to Senior Bishop William Graves, and he is
not a party to this appeal.





[3]At the time, the Tenth
Episcopal District encompassed Haiti, Jamaica, West Africa, Nigeria, Liberia,
and Ghana.  Carter testified that he would visit these countries at least four
times a year.





[4]Scott’s allegations
included negligent hiring, retention, and supervision.





[5]At trial, Scott produced
DNA results showing Carter’s semen was identified on his shirt, but this does
not support or disprove either scenario.





[6]Scott said that because
Carter regularly traveled to Africa, he was concerned that if Carter “ha[d]
something, that he could have given it to” him.





[7]Carter also complains that
Scott introduced no evidence of medical expenses related to medical treatment
or medication and did not identify the medication he was taking.  However,
Scott explained his lack of medical expense evidence by testifying that he
received treatment at the Dallas VA Medical Center due to his prior service in
the Army.  He was never asked to identify his medication.





[8]The timing of the “be
careful” statement is susceptible to different interpretations from Foreman’s
testimony, but it can be construed to have occurred on the day of the assault.

Q.  Okay.  Do you recall—let’s
kind of focus on the actual incident that occurred between Brother Scott and
Bishop Carter.

 

          Brother
Scott tells us that you had mentioned to him or he had mentioned to you
something about talking with Carter about becoming his driver.  Do you recall
that?

 

A.          
 I remember that.

 

Q.  And that he says
that you had advised him that he—to be careful, but that—not to worry about it,
but to be careful because you had heard that Bishop Carter was gay.  Is that
accurate?

 

A. I had talked to
him about this long before then.

 

Q. Okay.  And did
you tell him to be careful?

 

A. I think I did.

 

Q. Okay.  And then
did you know that he was going over to talk to Bishop Carter about being a
driver?

 

A. I did.  He called
me that day.

 

Q. Okay.  When you
told him about—to be careful, what did you say, do you recall?

 

A. I don’t remember exactly what I
said.  I just told him to be careful

However, Scott testified Foreman warned him
to be careful on the day of the “interview.”





[9]Benson clarified that the
“boys” in question were college students who helped run the band camp.